**Tyronne LINDSEY, Petitioner-Appellant,**

v.

**John T. KING, etc., et al., Respondents-Appellees.**

No. 85–3150.

United States Court of Appeals, Fifth Circuit.

Aug. 13, 1985.

Rehearing and Rehearing En Banc Denied Oct. 7, 1985.

---

Paul S. Weidenfold, Steven Lemoine and Herbert V. Larson, New Orleans, La. (Court-appointed), for petitioner-appellant.

William J. Guste, Jr., Baton Rouge, La., William C. Credo, III, Asst. Dist. Atty., Dorothy Pendergast, Gretna, La., for respondents-appellees.

Before GEE, POLITZ, and JOHNSON, Circuit Judges.

GEE, Circuit Judge:

Tyronne Lindsey, a death-sentenced inmate of the Louisiana State Penitentiary, appeals from the denial by the district court of his petition for a writ of habeas corpus. 28 U.S.C. § 2254. As grounds for relief, he alleges that the prosecutor failed to disclose exculpatory material as required by *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1965), and that his sixth amendment rights were violated by the ineffectiveness of his trial counsel. Finding merit in his Brady claim, we do not reach the issue of ineffectiveness of counsel.

### The Crime and The Trial

John Knopf and Stephen Birks were returning to their parked cars in the Oakwood Shopping Center in Gretna, Louisiana, at approximately 7:30 p.m. on the evening of December 19, 1979, when they

heard muffled screams. As they moved toward the screams, they noticed a vehicle approximately 10 to 15 feet from them with an open door. When Knopf shouted, the head of a young black male appeared above the passenger door and then disappeared as the black man ducked and ran from the car. A white woman also ran from the car. Knopf and Birks followed the black man, Birks running behind him but down the same aisle and Knopf running down the next parallel aisle. After the three men had run 30 to 40 feet, the black man turned and pointed a gun at Knopf, facing Knopf for five to ten seconds, and then ran on. During this confrontation, Knopf and the black male were separated by two rows of parked cars, a distance of 25 to 30 feet. A third person, Richard Alexander, also heard the screams and observed Birks and Knopf chasing the black man. At one point, the black man ran past Alexander at a distance of 40 to 50 feet.

After the black male escaped, those present turned their attention to the woman who had also fled the car. Earline Kidner had been shot in the back and was taken to West Jefferson Hospital, where she died the following day.

Immediately after the shooting, the Jefferson Parish Sheriff's Office initiated an investigation of the incident. Several investigators, including a Detective DeNoux, converged that evening at the shopping center. Deputy Kohler's initial field report identified Birks, Knopf and Alexander as potential witnesses but stated that Alexander "observed only Negro male fleeing from two witnesses. He does not feel he could identify perpetrator."

The next day, when the sheriff's office learned that Mrs. Kidner had died, Detective DeNoux was assigned to direct the investigation. That evening DeNoux obtained a statement from Birks which described the perpetrator as 5′6″ or 5′7″, 17–18 years old, with a short bush style haircut and wearing a dark waist-length jacket. The statement also indicates that Birks did not think he would be able to identify the assailant. At approximately the same time, Knopf gave a statement to Detective Nuzzolillo which described the assailant as 5′6″ or 5′7″, 17–18 years old, 130–150 pounds, with a short Afro haircut, no facial hair and wearing dark pants, dark shoes, a dark shirt and a light weight dark-colored waist-length jacket. His statement indicates that he felt he could make an identification. On December 22, the Jefferson Parish detectives received information that the defendant, Tyronne Lindsey, was a possible suspect. His photo was placed in a photographic lineup on December 23, at which time Knopf tentatively identified him as the perpetrator.

Four days after Knopf's tentative identification, DeNoux spoke with Alexander by phone. The police report describes the conversation in detail and notes that Alexander described the perpetrator as 5′4″ to 5′6″, 17–18 years old, 140 pounds, and wearing a dark brown jacket and blue jeans. The police report goes on to state that

> Mr. Alexander stated that he did not see the perpetrator's face and stated he saw only what he described as a "silhouette" of the perpetrator. *Mr. Alexander concluded that viewing any photographs would be useless because he did not see the perpetrator's face.* (emphasis added).

This excerpt from the police report has been referred to in this case as the "Alexander statement" and forms the basis for Lindsey's *Brady* claim.

The next development of significance occurred on January 3, when Tyronne Lindsey, Lester Thomas, Joseph Smith and Lawrence Clark, Jr., were arrested on other charges by the New Orleans Harbor Police. Detectives Hidding and Morton immediately went to the Harbor Police Station to photograph the four whom the Harbor Police had arrested. When Knopf viewed these Polaroid prints, he identified Tyronne Lindsey as the man who had pointed the gun at him. After learning of the positive identification, Detective DeNoux and Sergeant Beckendorf questioned Smith, Thomas and Lindsey about the

shooting of Mrs. Kidner. Joseph Smith told the officers that he knew nothing about the incident. Lester Thomas admitted that he was at the scene but stated that he had nothing to do with the actual murder, naming a Kenneth Batiste as the murderer. After Lester Thomas recorded his statement, Joseph Smith gave a second statement which implicated Tyronne Lindsey. He denied any first-hand knowledge of the incident, claiming that Lindsey had told him that he had committed the murder. Immediately after Smith gave his second statement, Lester Thomas gave another statement in which he changed the identity of the murderer from Kenneth Batiste to Tyronne Lindsey.

Tyronne Lindsey was then interviewed and his statement recorded. He admitted that he was present at the Oakwood Shopping Center on the evening of December 19, but denied any direct participation in the shooting of Mrs. Kidner. Lindsey stated that he went to the shopping center with Lester Thomas, Joseph Smith, and Sidney Moses for the purpose of snatching a purse. He claimed that one of the others told him to snatch Mrs. Kidner's purse but he refused. According to his statement, Lester Thomas and Sidney Moses then approached Mrs. Kidner to snatch her purse. He claims that Sidney Moses carried the gun and shot Mrs. Kidner. His statement gave accurate addresses for both Lester Thomas and Sidney Moses and described Moses' clothing on the evening of December 19 as blue jeans, a sweater, and a windbreaker. Sidney Moses bears a striking physical resemblance to Tyronne Lindsey.

The following day arrest warrants for Tyronne Lindsey, Lester Thomas, and Joseph Smith were issued. Several days later, on January 10, Mrs. Kidner's sister contacted Detective DeNoux. She had placed reward notices in the Times Picayune and spoken with Mr. Alexander. She told Detective DeNoux that Alexander now felt that he could identify her sister's assailant. The description of this conversation in the police report also notes that Alexander had previously said that he saw

only a silhouette and could not identify the perpetrator. Nevertheless, when Alexander was interviewed again on January 12, 24 days after the incident, he positively identified Tyronne Lindsey as the perpetrator. The police report of this interview indicates that Alexander had seen photographs of Lindsey, Thomas and Smith on television after their arrest for the murder of Mrs. Kidner, but he said he could not remember what the men on television looked like. The photograph of Tyronne Lindsey was also published in the January 4 "Times Picayune," a New Orleans daily paper. Shortly after Alexander's January 12 interview, the Jefferson Parish Police Department closed the case; and Tyronne Lindsey was indicted the next month.

The Indigent Defender Board was appointed to represent Lindsey, and his trial was set for July 14, 1980. Lindsey saw his trial attorney, George Richard, for the first time on May 23. A week later, Mr. Richard filed pretrial motions which included a Motion for Production of Exculpatory Evidence and a Prayer for Oyer seeking all prior statements of witnesses which could be used for impeachment purposes. The prosecutor made the following response to the Prayer for Oyer:

> Immediately after the commission of this offense, Richard Alexander stated that he did not know if he could make an identification of the suspect. Since the date of the crime, he became more certain in his ability to identify the man who committed the crime and has made a positive identification of Tyrone [sic] Lindsey on January 12, 1980.

> Mr. Alexander has stated that he had seen 3 Negro males on television just after their arrest, but could not remember then [sic] facial features after they appeared on television.

Mr. Richard, unsatisfied with this response, continued to press for disclosure of exculpatory material. He subpoenaed the district attorney's file and succeeded in getting an *in camera* inspection of the file by the state trial judge. After that inspection,

the trial judge ordered the prosecution to produce the statement by Richard Alexander which said that he "couldn't identify who it was" if it called Alexander to identify Lindsey as the perpetrator.[1] In response, the prosecutor produced the January 12 statement in which Alexander identified Lindsey but did not produce the earlier statement contained in the police report, in which Alexander indicated that he did not see the killer's face and could not identify him.

The case proceeded to trial. The state called Knopf as an identification witness and Alexander as a second identification witness. Birks was called as a corroborative witness. The state also presented Lindsey's statement in which he admitted that he was present when the murder occurred but denied involvement in the shooting. After presenting this evidence the state rested. The defense then called Lindsey's girlfriend and her sister as alibi witnesses and rested its case. Shortly thereafter the jury returned a guilty verdict, and the penalty phase of the trial began. During this phase of the trial, the state introduced evidence of prior convictions for simple burglary and simple battery. The defense called the pastor of a local church, Lindsey's parents, and his girlfriend. After less than two hours of deliberation the jury returned a verdict recommending the death sentence.

The original sentence was reversed on appeal, and a new trial was held solely for purposes of determining punishment. The three eyewitnesses testified again and Lindsey's statement was introduced. The defense then called Drs. DeVillier and Arnesen to show that Lindsey was mentally retarded, with an I.Q. of approximately 50. The alibi witnesses and character witnesses were also called. After deliberations, the second jury also agreed upon the death penalty.

---

1. The colloquy was, in material part:
"THE COURT:
All right, I have, in the interim, while you were gone, we checked the statement that I have with the transcripts of the tapes and I believe that you're entitled to the statements of Tyronne Lindsey and Lester Thomas, and that's the ones you talked about you were going to have here anyway. With regard to Richard Alexander and Stephen Birks, I think you would be entitled to them if they took the stand, and for purposes of identification of the defendant. If they don't take the stand, they really are of no moment to you, because the only thing that they have on it is that they denied the identity of whoever it was. They didn't deny the identity, but—
MR. BOUDOUSQUE:
I'm confused as to the individuals you're speaking of Judge.
THE COURT:
Richard Alexander and Stephen Birks, the two statements in here.
MR. BOUDOUSQUE:
Your Honor, based on that ruling, I will give Mr. Richard a copy of—
THE COURT:
They said they couldn't identify him. They didn't deny that it was him.
. . . .
MR. BOUDOUSQUE:
Okay, why does it apply to Richard Alexander? I don't understand the ruling.
THE COURT:
Because Richard Alexander and Stephen Birks, in their statements, say that they couldn't identify who—

MR. BOUDOUSQUE:
Possibly exculpatory—
THE COURT:
Yes, and then possible, if they do take the stand, or you attempt to put them on to identify him, then they would be exculpatory for the defendant because the defendant could say, you know, they gave a statement before, saying they couldn't identify who—
MR. BOUDOUSQUE:
Yes, Your Honor, I understand. Based on that—the Court's ruling—
THE COURT:
(To Mr. Richard) Do you understand that?
MR. RICHARD:
Yes, Your Honor.
. . . .
THE COURT:
I want to differentiate, for the record, any conclusions that the defense may draw that they said that the defendant was not the person. It doesn't say that. It just says they couldn't identify who it was. Do you understand? They didn't say it was and they didn't say that it wasn't. They just said they couldn't identify him.
MR. BOUDOUSQUE:
Your Honor, based on the Court's ruling, I will give Lester Thomas, Alexander and Birks, and those are the only statements that I have to comply with, according to the Court?
THE COURT:
Okay."

Lindsey appealed and his sentence was affirmed. After exhausting his state remedies, Lindsey began these proceedings by filing a petition for statutory habeas corpus in the United States District Court for the Eastern District of Louisiana, and an evidentiary hearing was held.

At the evidentiary hearing, the prosecutor testified that although he generally had an open file policy he could not remember whether he had given defense counsel access to the file in this particular case. After refreshing his memory with the trial transcript, he stated that before trial he gave defense counsel access to everything but the police report. Mr. Richard, defense counsel, testified that he was given access to some reports but that he did not see the police report. After reading the Alexander statement from the police report, he specifically stated that he "never did get" that particular statement. The prosecutor explained his failure to produce the Alexander statement contained in the police report by stating that he had determined that the statement "did not exist":

> "Q Now, we are about to leave this area and I just have a couple of questions if the Court will permit me, and that is, that the reason you did not disclose the part where he says, where it says 'Alexander concluded viewing any photographs would be useless because he did not see the perpetrator's face,' the reason you did not give that specific statement was that you concluded it was wrong from talking to Alexander?
>
> A I think that is argumentative. I did conclude that it was wrong, but I—
>
> Q You concluded it was wrong?
>
> A Absolutely, it was in error.
>
> Q Now, do you think that—because it was in error?
>
> A It was totally in error. It was like a typographical error in the report.

Q Now, isn't that a question of credibility of whether you believe it was said or not?

A I know it wasn't said.

Q Okay. You believe it wasn't said?

A I was told by a witness that at no time did he ever tell Officer Denoux that he did not see Tyrone Lindsey's face. He told me absolutely, 'I am positive, I never said that.' ...

. . . .

BY MR. WEIDENFELD:

Q You decided it was false, correct?

A No, I didn't decide it was false. I decided it didn't exist.

Q You decided it never happened?

A I am absolutely certain it never happened. It was in the report in error."

The statement is bracketed and marked with the word "incorrect" written in by the prosecutor on the copy of the police report in the record.

Despite this testimony, the magistrate concluded that Mr. Richard had seen the Alexander statement. This conclusion was based upon the fact that Mr. Richard used the word silhouette in cross-examining Alexander and the same word is used in the Alexander statement. While it is unclear whether the district court agreed with the magistrate's finding that Mr. Richard had seen the Alexander statement,[2] the district court did find that no Brady violation existed. Lindsey appeals this ruling.

### Analysis

Summarizing the significant matter that we extract from the foregoing, we confront a criminal prosecution in which the crucial issue is which of two persons, both admittedly present at the scene and difficult to distinguish from each other because strikingly similar in appearance, fired the fatal shot. Identification was difficult because of distance and poor light, and only two witnesses were willing to identify Appellant Lindsey as the assailant.

---

**2.** The district court purportedly adopted the magistrate's findings *in toto,* but at one place in his Oral Reasons, the trial judge stated "It seems that Mr. Richard probably did not get the police report." If the district court found that Mr. Richard saw the Alexander statement, that finding was clearly erroneous.

The police report states that one of these two, Mr. Alexander, stated in an interview conducted eight days after the murder that he did not see the assailant's face, that he saw only his silhouette, and that because of this circumstance viewing photographs would be useless. His testimony at trial was quite otherwise, comprising a positive identification, an assertion that he did see Lindsey's face, and another that he became satisfied that he could identify him later on the very night of the murder.[3]

The prosecutor, directly ordered by the trial court to produce the police report if he used Alexander as an identification witness, failed to do so and covered his tracks by producing a later statement in which Alexander claimed that he could identify Lindsey. Such conduct would be reprehensible in an ordinary case; where a man's life is at stake, it is beyond reprehension. Nor can there be much doubt that, one way or another, the impact of Alexander's trial testimony would have been lessened considerably, perhaps decisively, had the police report been given defense counsel as it should have been. Had Alexander been warned by the prosecutor that he had the report of his original statement to face, he would presumably have trimmed his testimony accordingly. Had he testified as he actually did at trial, he would almost surely have been ravaged on cross-examination. Neither occurred, and Lindsey's conviction and death sentence ensued.

As for the prosecutor's attempted explanation of his refusal to produce the police report—that the statement recorded in it "did not exist"—little need be said. This means no more than that the prosecutor did not believe that Alexander made it because Alexander later denied that he had done so. That is quite beside the point: It was for the jury, not the prosecutor, to decide whether the contents of an official police record were credible, especially where—as here—they were in the nature of an admission against the state's interest in prosecuting Lindsey. On such grounds as these, prosecutors might, on a claim that they thought it unreliable, refuse to produce any matter whatever helpful to the defense, thus setting *Brady* at nought. Such an explanation is laughable, offering it an effrontery. It does not wash, nor do we believe for a moment that the prosecutor could have been so simple-minded as to have believed it would.

It is one thing to be unsympathetic to trifling, repetitive and technical attacks on capital convictions fairly and honestly attained. It is quite another, however, when a panel of seasoned trial lawyers, now judges, surveys a trial record, contemplates the deliberately crippled cross-examination of a critical witness on the only serious issue in the case—identification, bears in mind that two suspects nearly identical in physical appearance were admittedly present at the poorly-lit scene, and entertains consequent doubts of a serious nature about who did the killing or even, in a far lesser vein, whether the convicted killer was permitted a fair chance to defend himself. Like it or not, so long as *Brady* stands the Constitution demands that both be true. In today's case, we are satisfied of neither.

That said, it remains that we are not a law unto ourselves. We do not sit as a court of revision, and even in a capital case we may not disregard the findings of a jury simply because the evidence supporting them leaves us unconvinced. The test that we must apply is otherwise, and to it we now turn.

### The Law

In *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that a defendant has a

---

**3.** Q You mentioned that after it happened you weren't quite sure that you could identify the party?
A Right.
Q Then later on when you revived your recognition, you could be more specific to identify the party. About how long did it take you to cure that doubt or cure that discrepancy on identification?
A That same evening after. After I saw what had happened, everything happened so fast, I wasn't sure.

constitutional right to information which is favorable to him possessed by the prosecution. In order to establish a violation of *Brady*, however, the defendant must show that the information was material to his defense either on the issue of guilt or the issue of punishment. *Id.* A subsequent decision held that if the defendant makes only a general request or no request at all, he must show that the undisclosed information created a reasonable doubt which did not otherwise exist. *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). According to *Brady*, if he makes a specific request, he need only show that the information might have produced a different result. Finally, a very recent decision, handed down since we heard oral argument in today's case, throws further—if somewhat flickering—light on the area.

*United States v. Bagley*, — U.S. —, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), involved a bench trial on charges of federal narcotics and firearms violations. Pretrial, defendant specifically requested information on any "deals, promises or inducements" made to government witnesses in exchange for their testimony. The government's response disclosed none as to its two principal witnesses, instead producing affidavit statements of their dealings with the defendant which concluded with the assertion that they were made without threats, rewards, or promises of reward. On the testimony of these witnesses, the district court convicted on the narcotics charges only.

The defendant later discovered government contracts, executed during the undercover investigation of him in which the witnesses had participated, agreeing to pay the witnesses for gathering evidence and testifying in court. Asserting a *Brady* violation, the defendant moved to vacate his sentence. The court denied his motion, however, concluding that the disclosure of the contracts would not have affected its decision and that their nondisclosure was therefore harmless. The Ninth Circuit disagreed, holding that a rule of automatic reversal applied in such cases.

On certiorari, five Justices concurred in a judgment reversing the circuit court and remanding the case to the district court "for a determination whether there is a reasonable probability that, had the inducement offered by the government to [the two witnesses] been disclosed to the defense, the result of the trial would have been different." — U.S., at —, 105 S.Ct. at 3383. The same five Justices also concurred in observing that "a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." — U.S., at —, 105 S.Ct. at 3381. Justices Brennan and Marshall would have applied a rule of automatic reversal, while Justice Stevens would have reversed in view of the specific request if there was any reasonable likelihood that the undisclosed matter could have affected the judgment of the trier of fact. Justice Powell did not sit. Viewing the opinions as a whole, it is fair to say that all of the participating Justices agreed on one thing at least: that reversal for suppression of evidence by the government is most likely where the request for it was specific, as in today's case. To it we now return.

### The Law Applied

■ In this case Lindsey's counsel began with a generalized request, but as the matter progressed his requests became more precise. He specifically requested access to the district attorney's entire file after the prosecutor told the trial judge that he had turned over everything but the police report. Thus Lindsey's counsel was specifically requesting access to the police report. The request was specific enough for the trial judge to agree to review the material *in camera* to see if it contained any *Brady* material, and the trial judge found that the report did in fact contain *Brady* material in the form of the original Alexander statement. After the *in camera* inspection, the court ordered the prosecutor to disclose that statement and the follow-

ing exchange took place between the prosecutor and the judge:

MR. BOUDOUSQUE:

Okay, why does it apply to Richard Alexander; I don't understand the ruling.

THE COURT:

Because Richard Alexander and Stephen Birks, in their statements, say that they couldn't identify who—

MR. BOUDOUSQUE:

Possibly exculpatory—

THE COURT:

Yes, and then possible, if they do take the stand, or you attempt to put them on to identify him, then they would be exculpatory for the defendant because the defendant could say, you know, they gave a statement before, saying they couldn't identify who—

MR. BOUDOUSQUE:

Yes, Your Honor, I understand.

After this colloquy, the prosecutor knew exactly what he was to produce. The judge had been reading the Alexander statement in the police report. Therefore, Lindsey need only show a reasonable probability that had the Alexander statement been disclosed, the outcome of either the guilt phase or the punishment phase of Lindsey's trial would have been different.

■ Nearly all of the evidence in this case consisted of the identification testimony of John Knopf and Richard Alexander, supported by a nonidentifying eyewitness, Stephen Birks. Richard Alexander's earlier statement that he did not see the perpetrator's face casts serious doubt upon the reliability of his later identification. The fact that the initial encounter took place after dark in a shopping center parking lot and lasted only 5–10 seconds also weakens Knopf's identification. The importance of a clear identification in this case is highlighted by Lindsey's own statement in which he explains that Sidney Moses, a companion who bore a striking resemblance to Lindsey, carried the gun and shot Mrs. Kidner. The importance of the Alexander statement in the guilt phase for purposes of impeaching Alexander's identifica-

tion testimony cannot be doubted. *See United States v. Ash,* 413 U.S. 300, 318, 93 S.Ct. 2568, 2577, 37 L.Ed.2d 619 (1973). Furthermore, the identification is even more important in the punishment phase, since a person may be found guilty of murder without proof that he killed or, at a minimum, contemplated that life would be taken but may not be sentenced to death without such proof. *See Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982).

And so we come at last to the end of our inquiry. Today's case is a closer one than *Bagley,* where the impeaching evidence which was withheld concerned both principal witnesses. Here it does not touch on the testimony of Mr. Knopf in any degree, testimony in which he made a most positive identification of Lindsey indeed. There can be no doubt that a reasonable trier of fact could have convicted Lindsey on the basis of Knopf's identification alone. Hence, it is possible to reason that even had the impeaching matter reduced the value of Alexander's identification to zero, it is not reasonably probable that the outcome as to guilt or punishment would have changed.

We are tempted, but not persuaded, by this arithmetical approach; our experience at the bar has been that positive identification by two unshaken witnesses possesses many times the power of such an identification by one only, and that the destruction by cross-examination of the credibility of one of two crucial witnesses—even if the other remains untouched—may have consequences for the case extending far beyond the discrediting of his own testimony.

We cannot and should not attempt to retry the case in our imaginations. We can say, however, on the basis of our courtroom experience, that the evidence withheld by the prosecutor in today's case carried within it the potential both for the destruction of Alexander's identification of Lindsey and the discrediting, in some degree, of the police methods employed in assembling the case against him. That done, given the circumstances that we have recounted of poor lighting, distance, short-

ness of time to view the assailant, a single unshaken identifying witness, another suspect of very similar appearance on the scene, the degree of proof required for conviction, and—perhaps most telling—the degree of conviction in the jurors requisite to imposing the penalty of death, we find our confidence in the results of the trial undermined.

Whether it is reasonably probable that a different result might have obtained had the evidence been disclosed is a question of agonizing closeness. This is a capital case, however, and one moreover in which our reading of the evidence shows there is a real possibility that the wrong man is to be executed. In such a case, if ever, petitioner should receive the benefit of the doubt.

For these reasons, the judgment is REVERSED. The Clerk is directed to remand the case to the district court with directions to issue a writ of habeas corpus ordering Lindsey released from state custody unless within ninety days from the date of our mandate the state shall commence a new trial.

REVERSED.