**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Ronald Earl GREEN, Defendant–
Appellant.**

No. 93–9002.

United States Court of Appeals,
Fifth Circuit.

Feb. 21, 1995.

F. Clinton Broden, John F. Carroll, Asst. Federal Public Defenders, Ira R. Kirkendoll, Federal Public Defender, Dallas, TX, for appellant.

Madeleine Johnson, St. Clair Theodore, Asst. U.S. Attys., Paul E. Coggins, U.S. Atty., Dallas, TX, for appellee.

Before SMITH and EMILIO M. GARZA, Circuit Judges, and STAGG, District Judge.[1]

---

1.  District Judge of the Western District of Louisi-   ana, sitting by designation.

TOM STAGG, District Judge:

Ronald Earl Green appeals from his jury conviction for the distribution of cocaine. For the reasons set forth below, we hold that Green has utterly failed to show that the prosecution committed a *Brady* violation. Thus, we affirm the jury verdict.

## I. FACTS

### A. The Drug Deal

In January of 1993, Special Agent Robert Crawford of the Drug Enforcement Administration ("DEA") was involved in an investigation of crack cocaine dealing in South Dallas. Barbara Howard was, at the time, acting as a confidential informant while awaiting sentencing in a drug case in which Agent Crawford had been involved. With the hope of a lighter sentence she agreed to provide information regarding a crack cocaine dealer known to her only by his street name, "Dirty–Dirty."

Howard had several previous contacts with "Dirty–Dirty." She was the only person involved in the investigation who had ever seen or met "Dirty–Dirty" prior to February 11, 1993. On February 10, 1993, in a tape-recorded telephone conversation, Howard spoke to "Dirty–Dirty" and made arrangements to purchase cocaine the next day. Detective John Childs of the Dallas Police Department was called to assist the DEA in the investigation. Detective Childs and Howard arrived in Howard's vehicle at a prearranged location and waited for "Dirty–Dirty." After a wait of thirty minutes, "Dirty–Dirty" drove up in a blue Nissan Maxima and parked on the passenger side of Howard's automobile. In explaining the delay, "Dirty–Dirty" exhibited white powder on his hands to Howard that indicated he was processing powdered cocaine to fill her order. This was Childs' first occasion to see "Dirty–Dirty" close-up and face-to-face.

"Dirty–Dirty" then left the scene for a few more minutes before reappearing in the same automobile. This time, "Dirty–Dirty" entered into the back seat of Howard's vehicle for two to five minutes and delivered more than 50 grams of crack cocaine in exchange for $3300, of which $400 was to be paid at a later date. This was Childs' second close-up view of "Dirty–Dirty." Meanwhile, the DEA surveillance team, comprised of Agent Crawford and Special Agent Jeffrey Green, monitored the scene. Agent Green, from an apartment window directly across the four-lane street, was observing the exchange with the use of a monocular. Agent Green testified that he was able to view "Dirty–Dirty" for approximately five minutes.

On February 24, 1993, Howard and "Dirty–Dirty" planned a meeting for Howard to pay the balance of $400 on the previous drug deal. This telephone conversation was also recorded. In the early afternoon that same day, Howard, accompanied this time in the passenger side of the car by Agent Crawford, met once again with "Dirty–Dirty." "Dirty–Dirty" arrived in a Jeep driven by another individual. "Dirty–Dirty" exited the Jeep and sat down in the rear seat on the driver's side of Howard's vehicle for three to five minutes. After some small conversation between all of those present in the car, "Dirty–Dirty" took the $400 from Howard and departed. This was Agent Crawford's occasion to have a close view of "Dirty–Dirty" for purposes of later identification.

### B. The Misidentification

Earlier in this scenario, sometime in January 1993, Agent Crawford showed Barbara Howard official mug-shots of a young black male and asked if she could identify the person. Howard testified that this meeting took place at night and that she was seated in her automobile outside of a store. It was dark and rainy and the lighting from the store window was poor. Howard told Crawford that she thought the photographs were of "Dirty–Dirty." She never stated that the pictures were of any person other than "Dirty–Dirty." The photographs shown to Howard, however, were actually of an individual named Tracy Scott King. As a result of Howard's tentative identification, all reports by law enforcement agencies thereafter contained the name, Tracy Scott King.

Defense counsel was never informed of the Howard misidentification incident by the Government. Rather, the information was

discovered only through defense counsel's cross-examination of Howard at trial. The defendant argues that the nondisclosure of this information violated *Brady*. This contention is the primary subject of the appeal presently before the court.

## C. The Sighting Of Ronald Earl Green And His Arrest

On April 8, 1993, Agent Green—who was also the Agent that observed "Dirty–Dirty" through his monocular on February 11—happened to pull up next to a person at a stop light driving the same blue Nissan Maxima that was driven at the February 11 meeting. He identified this person as the same man who delivered the drugs on February 11. Apparently, it was at this point that law enforcement personnel were able to conclude that "Dirty–Dirty" was, in fact, Ronald Earl Green, not Tracy Scott King. On April 15, 1993, an arrest warrant was issued for Ronald Earl Green and his arrest was effectuated on May 12, 1993.

## D. Written Reports By Law Enforcement Personnel

On April 8, 1993, the same day Agent Green identified "Dirty–Dirty" as Ronald Earl Green, Agent Crawford wrote a report reflecting that all further DEA reports should bear the true name of the individual who was known as "Dirty–Dirty," which was defendant Ronald Earl Green, instead of Tracy Scott King. Inexplicably, however, Agent Crawford also signed a report in which "Dirty–Dirty" was again identified as Tracy Scott King. This report was prepared partly on February 25, 1993—the day following the payment of the balance of money owed to "Dirty–Dirty"—and partly on May 27, 1993—more than two weeks following Green's May 12, 1993 arrest. It should be noted that this misidentification was disclosed to defense counsel.

Similarly, a report was signed by Officer Childs on June 29, 1993—about a month and a half after Green's arrest—regarding his involvement in the February 11 delivery. In this report, Childs also misidentified "Dirty–Dirty" as Tracy Scott King. This misidentification was also disclosed to defense counsel.

## E. The Trial

At Green's trial, the opening words from defense counsel were:

> They have got the wrong man. On February 11th, 1993, there was, indeed, a drug deal. But, there was no arrest made, not then. And in the days that followed you will hear testimony regarding the fact that the government, that is, more than one agent, in fact, indicated that the person that had made the delivery of the drugs was not Ronald Earl Green but another individual, man by the name of King.

Record, Vol. 3, at 94. Green's sole defense throughout the trial remained that it was Tracy Scott King who must have committed the crime, not Ronald Earl Green. The main thrust of Green's strategy centered around misidentifications contained in the written reports, Green and King's similar appearance, and evidence that King had previously been arrested in Green's blue Nissan Maxima.

Nonetheless, Green was identified as "Dirty–Dirty" before the jury by four witnesses, Barbara Howard, Agent Crawford, Officer Childs, and Agent Green. On Green's cross-examination of Howard—who was the first witness called—it was discovered that Howard had previously identified a photograph of Tracy Scott King as looking like "Dirty–Dirty.". After thoroughly questioning Howard about this misidentification in the presence of the jury, the defense moved for a mistrial or, in the alternative, a continuance based upon the nondisclosure of *Brady* information. Both motions were denied by the trial court after an evidentiary hearing.

Ronald Earl Green testified on his own behalf that he and Tracy Scott King had been friends since high school. He stated that other people had told him that he and Tracy Scott King were of similar appearance.[2] Also, he said that both he and Tracy

---

**2.** The linchpin in Green's argument at trial that the Government had "the wrong man" was the

similarity of appearance between Green and Tracy Scott King. Although this contention was

Scott King have a similarly placed gold tooth. Furthermore, he mentioned that he had allowed Tracy Scott King to borrow his car on previous occasions. This testimony was corroborated by police records showing that Tracy Scott King had been arrested in December of 1992 while driving Green's car.

In closing argument, defense counsel stressed to the jury that the Government had not met its burden of proof in showing that it was Ronald Earl Green who made the drug deal. Point by point, the defense counsel skillfully argued that Tracy Scott King must have been the culprit. He attacked Howard, Agent Crawford, Officer Childs, and Agent Green for their misidentifications. Indeed, he claimed in his closing that all of these Government witnesses were blatantly lying. Nevertheless, the jury returned a verdict of guilty against Ronald Earl Green on the one count indictment.

## II. THE LEGAL STANDARD

■ The only contested issue on appeal is whether the district court erred in concluding that *Brady* was not violated by the government's nondisclosure of a witness misidentification. In *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment." The prosecution must also disclose evidence useful to the defense for impeachment. *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985).

■ We review *Brady* determinations *de novo,* applying the *Bagley* standard. A successful *Brady* claim must show (1) the prosecution's suppression of the evidence, (2) the favorableness of that evidence, and (3) the materiality of that evidence. *Kyles v. Whitley,* 5 F.3d 806, 811 (5th Cir.1993) (citing *United States v. Sink,* 586 F.2d 1041, 1051 (5th Cir.1978)).

sufficiently expressed to the jury, Green also urges this panel to take a close look at photographs comparing the two men. As requested,

The Supreme Court defined materiality in *Bagley:*

> [E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

*Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383 (Blackmun, J.); *id.* at 685, 105 S.Ct. at 3385 (White, J., concurring in part). Thus, Green's conviction will be reversed only if the suppression of Howard's misidentification has undermined confidence in the outcome of the trial.

## III. APPLICATION OF LAW TO FACTS

### A. Does Brady Apply?

The Government argues that it owed no obligation under *Brady* because Howard's misidentification occurred during the intelligence gathering phase of its investigation. *See Moore v. Illinois,* 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972). We do not rule on this argument because of our dispositive holding, *infra,* that the disclosure of the information to Green would not have affected the outcome of the trial.

### B. The Nondisclosed Misidentification Did Not Affect The Outcome Of The Trial

■ We are not called upon to retry cases in our minds at the appellate level. Nevertheless, the very nature of the materiality prong of *Brady* forces us to use some hindsight to determine whether we are convinced that a criminal defendant received a fair trial.

Before trial, Green had requested and the district court ordered that the prosecution disclose all *Brady* material. Despite this directive, it was not until trial that the defense discovered, while cross-examining Barbara Howard, a primary government witness, that Howard had previously misidentified a photograph of a person known by the street name of "Dirty–Dirty." The photograph was of Tracy Scott King, and not Green. The

we have carefully examined these photographs. *See* Appendix A.

defendant immediately contended, and contends today, that this nondisclosure violated *Brady*.

Green asserts that had he known of Howard's misidentification, he would have altered his pre-trial and trial strategy, affecting the outcome of the trial. He argues that he would have cross-examined Howard in a much different fashion consistent with a model cross-examination with which he was familiar. He would have called an eyewitness identification expert to testify as to the problems associated with cross racial identifications, both generally and as it specifically applied to this case. He would have called witnesses to corroborate Green's statement that he and Tracy Scott King look alike. Finally, he would have used pictures of Green and Tracy Scott King throughout the investigation of the case.[3] In sum, Green claims that had he known about the misidentification, he would have been able to discredit Howard's testimony and to argue more effectively that the drug dealer was King, not Green.

### 1. Cross-examination of Howard

Green contends that he would have been better able to impeach Howard—whom he characterizes as the Government's "key witness"—had he known about the prior misidentification. We will assume, *arguendo,* that Howard would have been discredited. As she was just one of many witnesses, however, the question remains whether Howard's impeachment raises a reasonable probability that the outcome of the case would have been different.

To address the issue of the other witnesses, Green relies upon a series of cases that he argues stand for the proposition that evidence which allows a defendant to discredit a witness's in-court identification is necessarily material. For example, Green cites *Lindsey v. King*, 769 F.2d 1034, 1040–43 (5th Cir.1985), in which the defendant was convicted by a jury of capital murder and sentenced to death. One of the witnesses was

actually involved in chasing the defendant from the scene of the crime, while the other only saw the defendant run by him at a distance of forty to fifty feet. Both witnesses were able to make an in-court identification of the man.

It was not discovered until an evidentiary hearing in the defendant's habeas corpus proceeding, however, that the Government had failed to disclose to the defendant a relevant police report. This report contained an interview with the identifying witness who had observed at a distance of forty to fifty feet the defendant fleeing from the scene. In this interview, which was conducted eight days after the murder, the witness stated that he did not see the defendant's face, that he saw only his silhouette, and that because of this circumstance viewing photographs would be useless. Of course, his testimony at trial was quite the opposite.

We stated that a reasonable trier of fact could have convicted the defendant based upon the one positive witness identification remaining. *Id.* Thus, even if the other witness' testimony had no value, it was possible to say that there was not a reasonable probability that the outcome would have been different. But, we were not coaxed into using this "arithmetical approach." *Id.* Instead, we ruled that the defendant's conviction be reversed, reasoning that:

> our experience at the bar has been that positive identification by two unshaken witnesses possesses many times the power of such an identification by one only, and that the destruction by cross-examination of the credibility of one of two crucial witnesses—even if the other remains untouched—may have consequences for the case extending far beyond the discrediting of his own testimony.

*Id.*

While we do not depart from our prior statement that an arithmetical approach should not be used, it should be recognized that the present case differs in many re-

---

**3.** Green also claims that had he known about the misidentification, he would have moved to have Howard's in-court identification suppressed as impermissibly suggestive. Because Green raises this issue for the first time in his reply brief, it is waived. *See United States v. Miller,* 952 F.2d 866, 874–75 (5th Cir.1992).

spects from the *Lindsey* case. *Lindsey* itself highlights some of these distinctions:

> [T]he evidence withheld by the prosecutor in today's case carried within it the potential ... for the destruction of [the observing witness'] identification of [defendant].... That done, given the circumstances that we have recounted of poor lighting, distance, shortness of time to view the assailant, a single unshaken identifying witness, another suspect of very similar appearance on the scene, the degree of proof required for conviction and—perhaps most telling—the degree of conviction in the jurors requisite to imposing the penalty of death, we find our confidence in the results of the trial undermined.

*Id.*

In the present case, there are three witnesses other than Howard, all of whom are law enforcement personnel, who were easily able to identify Green as the man who made the drug deal. Furthermore, each of these witnesses was able to view Green at a shorter distance, for a greater length of time, and in better conditions than the one remaining witness in *Lindsey*.

On February 11, 1993, at 12:45 P.M., in broad daylight, Detective Childs and Howard spoke to Ronald Earl Green, who had pulled his car alongside theirs, for three to five minutes. They spoke once again thirty minutes later when Green returned. He was inside Howard's car for two to five minutes. During this time, Detective Childs, who was in the front passenger seat, was in close quarters with Green, who was in the rear seat on the driver's side. In fact, Childs was the person who actually exchanged the money and drugs with Green. Meanwhile, Agent Crawford and Agent Green were in their surveillance position, with Agent Green observing the man through the use of a monocular. Detective Childs and Agent Green both testified in court that Ronald Earl Green was the man who delivered the drugs.

On February 24, 1993, in the early afternoon, Howard and Agent Crawford met with Green in Howard's car for the purpose of paying the balance on money owed for the prior drug deal. Once again, Green sat in the rear seat on the driver's side. Agent Crawford was in the passenger seat. Crawford, Green, and Howard engaged in conversation for three to five minutes, with Crawford being able to observe Green from this favorable vantage point. Agent Crawford testified in court that Ronald Earl Green was the man who was present on this occasion.

On April 8, 1993, Agent Green observed defendant Green at a stop light while defendant Green was driving the same blue Nissan Maxima that had been used in the February 11, 1993, drug deal. At this encounter, Agent Green had pulled his car next to defendant Green's; both men had their windows down. It should be recalled that Agent Green was the person using the monocular in his surveillance position on February 11. Agent Green testified in court that defendant Green was the man who was driving the Nissan Maxima both on February 11 and April 8, 1993.

Thus, the facts of this case are a far cry from those confronted in *Lindsey*. Here, three law enforcement witnesses gave credible testimony that was strengthened by the vantage points from which they were able to observe Green. Their eyewitness identification testimony in court was not impeached, even to the slightest degree. Any misidentifications of "Dirty–Dirty" made in some of their reports was sufficiently explored by defense counsel. In fact, the entire misidentification theory was fully tried before the jury, as the record reveals that this issue was argued by Green *ad nauseam*. Therefore, we are confident that the jury still would have found Green guilty regardless of whether Howard's testimony was discredited.

### 2. Trial strategy

Green also asserts that had he known of Howard's misidentification, he would have been more effective in arguing the identity question. He claims he would have called an expert to testify regarding problems with racial identification and sought corroborating witnesses to testify that King and Green look alike. Green also maintains that he would have been able to show photographs to witnesses during the case highlighting the simi-

larities between Tracy Scott King and Ronald Earl Green.

We conclude that knowledge of Howard's misidentification would not have changed Green's strategy. The misidentification would certainly have supported Green's theory, but it would not have changed it. Thus, whether an expert would be called by Green was not affected by the new information. Also, the decision whether to try to get corroborating witness testimony for Green's contention that he and Tracy Scott King look alike was not upset. Similarly, the use of photographs to show the resemblance between the two men could not have been a newly discovered idea, given the strategy already in place. Finally, a model cross-examination of Howard would not have made a difference because the jury heard all of the problems associated with Howard's testimony. Thus, the jury was able to judge her credibility. In sum, there is no reasonable probability that the result would have been different. Our confidence in the outcome of the trial is not undermined to any extent. *See Bagley, supra.*

## IV. DISTRICT COURT COMMITTED PLAIN ERROR IN SENTENCING

During sentencing, the trial court erroneously included a seven year old juvenile offense in the calculation of Green's criminal history category. Both parties agree that the district court committed plain error by including this offense in its sentencing calculation.

Accordingly, the judgment of conviction is AFFIRMED, and the judgment of sentence is VACATED and REMANDED for resentencing.

## APPENDIX A

Defendant's Exhibit 9 is a "mug shot" of Tracy Scott King.

Defendant's Exhibit 10 is a "mug shot" of Ronald Earl Green