UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 94-10490
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DONALD JACKSON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Texas
_____

(April 18, 1995)

Before POLITZ, Chief Judge, REAVLEY, and BARKSDALE, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

Donald Jackson appeals his convictions for assault with intent to steal money and property of the United States, and for using and carrying a firearm during a crime of violence, claiming that, because new counsel was appointed for him between his first and second trials, that counsel was entitled, under § 3161(c)(2) of the Speedy Trial Act, 18 U.S.C. § 3161(c)(2) (generally, trial not to "commence less than thirty days from the date on which the defendant first appears through counsel"), to have 30 days to prepare for the second trial, which instead commenced 12 days after counsel was appointed, with only seven days notice of the setting, and despite Jackson seeking a continuance to obtain an expert witness on eyewitness identification. He contends also that a

peremptory strike was on the basis of economic status, and, therefore, violated the equal protection component of the Fifth Amendment's due process clause.  We **AFFIRM**.

I.

On October 15, 1993, at approximately 5:30 p.m., the Mailroom Express, a contract station of the United States Postal Service in Dallas, Texas, was robbed at gunpoint.  Daryl Sprout, the manager, testified that the robber leapt over the counter, ordered him to fill a white plastic bag with money from the cash registers, and then ordered him to lie on the floor.  Sprout told the robber he should run.  Sue Hayes, a customer who walked in during the robbery, testified that the robber ordered her to the floor and threatened to kill her.

The robber then jumped back over the counter, and ran out of the station.  Sprout got up, went over the counter, looked out the door, and saw a man, whom he identified later as Jackson, in the passenger seat of a car that had just pulled out of a parking space in front of the station.  Sprout noted the license plate number; and police traced the vehicle to Glenn Brager, Jackson's half-brother.

Brager testified that, on the day of the robbery, he loaned his car to Jackson between 4:00 and 4:30 p.m., so that Jackson could pick up money that was being wired to him at the station; that Jackson returned with the car shortly thereafter; that, about an hour later, Jackson asked to borrow the car again; and that, instead of letting Jackson use his car, he drove Jackson to the

- 2 -

station around 5:00 or 5:30 p.m.  Brager testified that, when they arrived at the Mailroom Express, Jackson got out of the car and returned a few minutes later.  Brager did not see Jackson carrying a gun, money, or a white plastic bag, and testified that Jackson did not seem anxious or nervous.  (But see note 9, *infra*, concerning Jackson then telling Badger about Jackson's "confrontation" in the station.)

A postal inspector testified that, on October 25 (ten days after the robbery), Jackson gave a sworn statement in which he denied committing the robbery and stated that, although he and Brager went to the Mailroom Express two or three times on October 15 (the day of the robbery), they were at a barber shop from 4:30 until 7:30 p.m.

On October 22 and 28, Sprout and Hayes, respectively, were shown photographs of six individuals, including Jackson; each identified Jackson as the robber.  And, both identified Jackson in court.  Moreover, each testified that they were positive that Jackson was the robber: Sprout testified that he had a clear view of the robber's face on three separate occasions -- (1) when the robber pointed the gun at him, (2) when he told the robber that he should run, after putting the money from the cash registers into the bag, and (3) when the robber was in the getaway car; and Hayes testified that she got a good look at the robber from a distance of two and one-half to three feet, and that she would never forget his face.

Jackson's first trial ended in a mistrial when the jury was unable to reach a verdict. The district court granted Jackson's retained counsel's motion to withdraw; appointed new counsel; set trial, on seven days notice, to commence 22 days after the first ended; and denied a continuance.

At his second trial, Jackson was convicted for assault with a handgun with the intent to steal money and property of the United States, in violation of 18 U.S.C. § 2114, and for using and carrying a firearm during the commission of a crime of violence, in violation of 18 U.S.C. § 924(c).[1] Jackson was sentenced, *inter alia*, to 322 months imprisonment -- 262 months for assault, 60 for the firearm count.

## II.

Jackson contends that the district court erred by denying his request for a continuance to allow appointed counsel at least 30 days to prepare for the second trial, pursuant to the Speedy Trial Act; and by permitting the Government to use a peremptory challenge to exclude a potential juror on the basis of economic status, in violation of the equal protection component of the Fifth Amendment's due process clause.

---

[1] Jackson had been indicted also for assaulting an officer or employee of the United States while that individual was performing his official duties, in violation of 18 U.S.C. § 111, but that charge was dismissed, on the Government's motion, prior to the first trial.

Jackson was indicted on November 18, 1993, and made his first appearance with retained counsel on November 30. Retained counsel represented him at his first trial, which commenced on February 7, 1994, and ended in a mistrial on February 9. After Jackson's retained counsel moved to withdraw on February 17, because Jackson was unable to pay for representation at a second trial, Jackson moved to proceed *in forma pauperis* and for appointment of counsel.

On February 18, the magistrate judge appointed the Federal Public Defender to represent Jackson. And, five days later, on February 23, the district judge (who presided also at the first trial) set trial for March 2. On February 25, Jackson moved for a continuance, based on the need to acquire a parole revocation hearing transcript, which allegedly contained statements by Sprout that were favorable to the defense on identification, and to procure the testimony of an expert witness, Dr. Malpass from El Paso, Texas, on the reliability of eyewitness identification.[2] Jackson did not cite or refer to the Speedy Trial Act.

On March 1 (the day before trial), Jackson filed an amended motion, seeking a continuance pursuant to the Speedy Trial Act. Attached to the motion was a letter from Dr. Malpass, in which he

---

[2]    In the continuance motion, counsel stated that the Federal Public Defender's office was appointed to represent Jackson on Friday, February 18; that he was assigned the case late that afternoon; and that, because Monday, February 21, was a federal holiday, he was unable to determine where his client was located and to begin work on the case until Tuesday, February 22. At sentencing, Jackson stated to the court that counsel spent only approximately 45 minutes with him prior to trial; counsel stated that he met with Jackson "once or twice" before trial.

stated that he was willing to testify for Jackson, but could not do so on such short notice; and that he could offer information to the jury that would assist it in overcoming widely held misconceptions in areas of eyewitness identification, such as cross-racial face recognition and identification, the effects of the presence of a weapon, the effects of previous viewing of a face, and the relationship between a witness' confidence in an identification and its accuracy. In the alternative, Jackson requested that Dr. Malpass be subpoenaed. That same day, the court, without ruling on the continuance, granted the subpoena request.

Jackson's second trial began on March 2. Before jury selection, his counsel advised the court that he had spoken with Dr. Malpass and had told him that service of a subpoena would be attempted; and that Dr. Malpass indicated that he would be unable and unwilling to give expert testimony because he had not had sufficient time to prepare. The district court denied Jackson's continuance motion, stating that mistaken identification was "a somewhat charitable description of the defense", and that it had issued the Malpass subpoena "out of an abundance of caution".

### 1.

Jackson contends that the district court's denial of a continuance and decision to retry the case on seven days' notice violated § 3161(c)(2) of the Speedy Trial Act, which provides:

> Unless the defendant consents in writing to the contrary, the trial shall not commence less than thirty days from the date on which the defendant first appears through counsel or expressly waives counsel and elects to proceed pro se.

18 U.S.C. § 3161(c)(2).  "The facts underlying a ruling involving the Speedy Trial Act are reviewed for clear error, and the legal conclusions of the court are reviewed *de novo*."  **United States v. Storm**, 36 F.3d 1289, 1292 (5th Cir. 1994).  Although his retained counsel had more than 30 days to prepare before the first trial, Jackson, relying on our court's recent decision in **Storm**, contends that § 3161(c)(2) entitled him to a new 30-day period after new counsel was appointed for the second trial.

Jackson's reliance on **Storm** is misplaced.  Storm and a co-defendant, both represented by the same counsel, first appeared before the district court on February 12, 1993, at which time trial was set for March 15, and a hearing for February 19, to determine whether counsel could represent both defendants.  **Storm**, 36 F.3d at 1292.  At the February 19 hearing, the court determined that counsel could not represent both defendants, and appointed the Federal Public Defender to represent Storm; Storm appeared that same day with his new counsel.  **Id**.  Our court held that Storm was tried in violation of § 3161(c)(2), because his first appearance with counsel was on February 19, less than 30 days before trial commenced on March 15.  **Id**. at 1293.  But, as discussed in part II.A.2. *infra*, it held also that Storm was not prejudiced by the violation.  **Id**. at 1294.

**Storm**'s holding that § 3161(c)(2) was violated is based on the particular facts and circumstances of that case, which are not

remotely similar to those here.[3]  As quoted in note 3, *supra*, our court noted in **Storm** that, even assuming Storm's first appearance with counsel was sufficient to start the § 3161(c)(2) 30-day period, it would be unconscionable to start the period on the basis of that representation, because the attorney had continued to represent Storm after having given the government an affidavit in which Storm admitted his own involvement in the transactions at issue and attempted to exculpate his co-defendant, whom counsel also represented.  *See* **id**. at 1293-94.  As stated, such circumstances are not present here.  Moreover, Jackson, unlike Storm, was represented by retained counsel at a trial for which he had more than the 30 days required by § 3161(c)(2) in which to prepare Jackson's defense.  In short, **Storm** does not stand for the proposition that § 3161(c)(2) requires a new 30-day trial preparation period each time a defendant changes counsel.[4]

---

[3]     The court stated in **Storm**:

> Even assuming that the first appearance of the defendant before the court with an attorney other than trial counsel is sufficient to start the running of the 30-day period contemplated in § 3161(c)(2), *under the circumstances of this case*, we would not allow Storm's appearance with [the first] attorney ... to start the clock.

36 F.3d at 1293 (emphasis added).

[4]     Needless to say, to interpret **Storm** and § 3161(c)(2) otherwise would enable a defendant represented by retained counsel to postpone his trial by dismissing his attorney and retaining new counsel on the eve of trial.  Likewise, a defendant represented by appointed counsel could refuse to cooperate in an attempt to force the withdrawal of counsel, so that he could delay his trial.  Along that line, in the context of a superseding indictment, our court has held that a defendant may not use the Act as a "two-edged sword" by insisting on a claimed right to have 30 days after the

As stated, the Act provides for a 30-day period for trial preparation, measured "from the date on which the defendant first appears through counsel". 18 U.S.C. § 3161(c)(2). But, it does not provide for a new 30-day period each time the defendant obtains different counsel. In **United States v. Rojas-Contreras**, 474 U.S. 231 (1985), the Supreme Court addressed whether § 3161(c)(2) requires a new 30-day period after the filing of a superseding indictment. It stated that the language of § 3161(c)(2) was "unambiguous" and "clearly fixe[d] the beginning point for the trial preparation period as the first appearance through counsel". Accordingly, it held that the 30-day period did not begin anew with a superseding indictment. *Id*. at 234. The Court noted that the Speedy Trial Act gives the district courts broad discretion to grant continuances when necessary to allow further trial preparation, pursuant to § 3161(h)(8), which authorizes a continuance if "the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial". *Id*. at 236 (quoting 18 U.S.C. § 3161(h)(8)).

---

superseding indictment in which counsel may prepare for trial, and then complaining that the resulting delay violated the Speedy Trial Act's requirement that a defendant be tried within 70 days of indictment. *See* **United States v. Eakes**, 783 F.2d 499, 503 (5th Cir.), *cert. denied*, 477 U.S. 906 (1986); *see also* **United States v. Bigler**, 810 F.2d 1317, 1322 (5th Cir.) (30-day period under § 3161(c)(2) is not excludable from 70-day period), *cert. denied*, 484 U.S. 842 (1987). Similarly, the Seventh Circuit has held that when a defendant appears through counsel, his subsequent decision to proceed *pro se* does not trigger a new 30-day preparation period, noting that, "[t]o interpret the statute otherwise would enable a defendant to postpone his prosecution by deciding on the eve[] of trial that he wants to dismiss his attorney and represent himself". **United States v. Moya-Gomez**, 860 F.2d 706, 741-42 (7th Cir. 1988), *cert. denied*, 492 U.S. 908 (1989).

In sum, we hold that, when a defendant is represented by counsel who has had at least 30 days in which to prepare for trial, as Jackson was, § 3161(c)(2) is satisfied; the retention or appointment of new counsel does not trigger a new 30-day period.[5] Obviously, this does not mean that the defendant must be compelled invariably to go to trial less than 30 days after the retention or appointment of new counsel. As the Supreme Court pointed out in **Rojas-Contreras**, the district court has discretion, under §

---

[5]     Our holding is consistent with **United States v. Bigler**, in which our court held that, because the Government failed to seek appointment of counsel in time to permit 30 days for trial preparation, trial more than 70 days after the defendant withdrew his guilty plea violated the Speedy Trial Act.  Counsel was appointed to represent Bigler on January 31, 1986.  810 F.2d at 1318.  Trial had been set for March 3, but appointed counsel could not be present then.  **Id**.  Upon the district court advising Bigler that he could either ask for a continuance or accept another court-appointed lawyer and go to trial on March 3, Bigler opted for the latter.  **Id**.  Accordingly, new counsel was appointed on February 3. **Id**.  The district court, referring to the Speedy Trial Act, and noting that trial was scheduled in 28 days, asked Bigler if he wanted to waive the 30-day requirement, or go to trial on March 5 rather than March 3.  **Id**.  Bigler chose March 5, but did not ask for a continuance to allow 30 days for trial preparation.  **Id**. at 1318-19.  Bigler later claimed a violation of the Speedy Trial Act, because his trial did not commence within 70 days after he withdrew his guilty plea.  **Id**. at 1319.

Our court held that Bigler's appearance with newly appointed counsel was a "first appearance with counsel" pursuant to § 3161(c)(2), noting that "[n]ot until then was preparation for his defense possible in any meaningful manner".  **Id**. at 1322.  It rejected the Government's contention that the 30-day preparation period was excludable from the 70-day period for going to trial, stating that "defendants are entitled both to a thirty-day preparation period and to a trial within the seventy-day time limitation".  **Id**. at 1322.  But, on rehearing, our court stated that its holding that Bigler's appearance on February 3 was a "first appearance with counsel" did "not imply that Bigler would be automatically entitled to a second thirty-day period if his attorney were to withdraw or be removed from the case".  **United States v. Bigler**, 817 F.2d 1139, 1141 (5th Cir. 1987).

- 10 -

3161(h)(8), to grant a continuance for trial preparation if it determines that the ends of justice so require. *See* ***Rojas-Contreras***, 474 U.S. at 236.

2.

In the alternative, and as noted, even if we were to assume a violation of § 3161(c)(2), our inquiry would not end. "[B]ecause Congress failed to provide a sanction for the violation of § 3161(c)(2), a defendant must show that he was prejudiced by such violation". ***Storm***, 36 F.3d at 1294.[6] Jackson contends that he was prejudiced because the denial of a continuance deprived him of

---

[6] Jackson contends that prejudice should be presumed where defense counsel had only seven days notice of trial, and that giving counsel only seven days to prepare for trial in a case involving a potential sentence of over 25 years is a *per se* violation of Fifth Amendment due process. Because, as detailed below, neither contention was raised in district court, we apply plain error review; and, in so doing, we decline to exercise our discretion to consider the issues for the first time on appeal. *See* ***United States v. Calverley***, 37 F.3d 160, 162-64 (5th Cir. 1994) (en banc), *cert. denied*, ___ U.S. ___, 115 S. Ct. 1266 (1995). In his original continuance motion, Jackson asserted the need to acquire a transcript from his parole revocation hearing, and to procure the testimony of an expert witness regarding the reliability of eyewitness identification, but did not cite the Speedy Trial Act as authority. He did not contend that the allowance of only seven days to prepare for trial was presumptively prejudicial or that it would constitute a *per se* violation of the due process clause. Nor were these issues raised in the amended motion, which raised the Speedy Trial Act.

In addition, Jackson asks us to refer this case for en banc rehearing to consider overruling prior precedent in order to hold that a violation of § 3161(c)(2) is reversible error *per se*. If Jackson desires en banc rehearing, he must follow the requirements set forth in the Federal Rules of Appellate Procedure and our local rules. *See* Fed. R. App. P. 35; 5th Cir. Loc. R. 35.

expert eyewitness identification testimony necessary to establish a misidentification defense.[7]

"If a continuance is sought because of the unavailability of a witness, the movant must show the court that `due diligence has been exercised to obtain the attendance of the witness, that substantial favorable evidence would be tendered by the witness, that the witness is available and willing to testify, and that the denial of the continuance would materially prejudice the defendant.'" *United States v. Scott*, ___ F.3d ___, ___, 1995 WL 121345, at *4 (5th Cir. Mar. 21, 1995) (internal quotation marks and citations omitted). Moreover, whether to admit expert testimony on eyewitness reliability "is squarely within the discretion of the trial judge". *United States v. Moore*, 786 F.2d 1308, 1312 (5th Cir. 1986).[8]

Assuming both that the court would have exercised its discretion to allow Dr. Malpass' testimony, and that the various requisite factors for a continuance, other than the prejudice factor, were satisfied, that factor would still be wanting. As

_____

[7]  In his reply brief, Jackson speculates for the first time that, if the defense had had time to conduct an investigation before trial, it might have discovered that the eyewitnesses had a motive to falsely identify Jackson as the robber, or that Jackson's half-brother testified against him pursuant to some undisclosed promise. It is well-settled that, generally, we will not consider issues raised for the first time in a reply brief. *See, e.g.*, *United States v. Green*, 46 F.3d 461, 465 (5th Cir. 1995). Accordingly, we decline to address these.

[8]  There is nothing in the record as to whether Jackson attempted to locate an eyewitness identification expert in Dallas, or why it was necessary to retain one from El Paso, over 600 miles away. At oral argument, counsel stated that he did not know whether such an expert was available in Dallas.

stated, two witnesses (the store manager and a customer, each of whom testified that they had a good opportunity to view the robber) identified Jackson positively and independently from photographic line-ups containing six photographs each. In light of the corroboration of the eyewitness identifications by Jackson's own half-brother, whose testimony placed Jackson at the scene of the robbery when it occurred,[9] and Jackson's sworn statement to investigators, in which he contradicted his brother's version of the events on the day of the robbery, it is most improbable, to say the least, that Dr. Malpass' generalized testimony about the supposed unreliability of eyewitness identifications would have established a reasonable doubt as to the identity of the robber. *See United States v. Laury*, ___ F.3d ___, ___, 1995 WL 125938, at *3 (5th Cir. 1995). Accordingly, in the alternative, Jackson has failed to establish that he was prejudiced materially by the denial of a continuance.

### B.

During jury selection, when four of the six blacks on the venire were struck peremptorily by the prosecutor, Jackson objected; and the district court ordered the prosecutor to state

---

[9] For example, Jackson's half-brother testified that Jackson seemed angry, but not excited, nervous, or afraid, when Jackson got back into his car after leaving Mailroom Express; Jackson told Brager he had had a "confrontation" with the person at Mailroom Express.

the reasons for the strikes.  Jackson makes an extension of *Batson* challenge as to one of them.[10]

For the strike in issue, the prosecutor stated both that the venireman had given him a hostile look when, during *voir dire*, he called the court's attention to the fact that the jurors were seated out of order and asked that the juror change places with the juror seated next to him, and that the juror was a retired custodian, and his low income indicated a possible tendency to sympathize with the defendant, who was unemployed.  Jackson responded that the reference to a hostile look was "nebulous", and asserted that the Government had discriminated against the venireman because he was poor.  The district court found that the strike was not racially-motivated, stating that "[w]hether [the prosecutor's] judgment[] about a hostile look on the part of [the juror] ... is correct is the sort of intuitive judgment that I think the courts have to rely on counsel to exercise".

Jackson asks us to extend the reasoning of *Batson v. Kentucky*, 476 U.S. 79 (1987), and hold that a peremptory strike on the basis of economic status violates the equal protection component of the Fifth Amendment's due process clause.  He acknowledges that *United States v. Pofahl*, 990 F.2d 1456, 1466 (5th Cir.), *cert. denied*, ___ U.S. ___, 114 S. Ct. 266, 560 (1993), accepted economic status as a non-racial motivation, but maintains that *Pofahl* is not controlling, because he is not contending that the strike was

---

[10]    For the three peremptory strikes he does not contest, Jackson states that the Government "provided adequate race neutral reasons".

- 14 -

racially-motivated; instead, he claims that a peremptory challenge based on economic status, without regard to race, violates equal protection.

We need not reach whether to extend *Batson* in this fashion.[11] As noted, the strike was motivated not only by the venireman's economic status, but also because of the prosecutor's perception that he had given him a hostile look. We agree with the district court that this is the sort of intuitive judgment that courts generally must rely on counsel to exercise in good faith. Jackson does not suggest, and the record does not reflect, that the prosecutor's explanation lacked credibility. *See Pofahl*, 990 F.2d at 1466.

### III.

For the foregoing reasons, the judgment is

**AFFIRMED.**

---

[11] Although we do not reach the extension of *Batson* issue, it is well to note that, in extending *Batson* to prohibit gender-based strikes, the Supreme Court expressly disavowed the implication that peremptory challenges were being eliminated. *J.E.B. v. Alabama ex rel. T.B.*, ___ U.S. ___, 114 S. Ct. 1419, 1429 (1994). Moreover, it is most arguable that extending *Batson* in the manner urged by Jackson would go far toward achieving that precise result, and would "conflict with a State's legitimate interest in using such challenges in its effort to secure a fair and impartial jury". *See id.*