Affirmed and Opinion filed June 30,
2011.

 

In
The

Fourteenth
Court of Appeals



NO. 14-10-00884-CR



Tommy Javone
Seamster, Appellant 

v.

The State of
Texas, Appellee 



On Appeal from
the 232nd District Court

Harris County, Texas

Trial Court
Cause No. 1245998



 

OPINION

A jury convicted appellant Tommy Javone Seamster of
one count of aggravated robbery and assessed punishment at twenty years’
imprisonment.  Appellant moved for a new trial based on an allegation of
ineffective assistance of counsel, and the trial court denied the motion after
holding an evidentiary hearing.  Appellant challenges his conviction on the
single ground that the trial court abused its discretion by denying the motion
for new trial.  We affirm.

Background

            At
about 10:00 a.m. on December 26, 2009, two men entered the convenience store of
a Shell gas station where Sonny Singh worked.  One of the robbers, with his
face exposed at first, pointed a gun at Singh and demanded all the money.  The
robbers fled with the money from the cash register.  Later that day, Deputy
Craig Berry of the Harris County Sheriff’s Office apprehended appellant and
codefendant DeAndre Parker and brought them back to the scene of the crime.  Among
other evidence the State presented at trial, Deputy Alejandro Adames testified
that Singh positively identified appellant during a show-up identification.  Singh
testified that he was “sure” about the show-up identification.  He also made an
in-court identification, implicating appellant as one of the two robbers.  The
jury found appellant guilty.

After trial, appellate counsel filed a motion for new
trial alleging that trial counsel Patrick Ruzzo rendered ineffective assistance
because he failed to conduct an investigation that would have revealed a video
showing Singh’s failure to pick appellant’s picture from a photo spread.  The
trial court held a hearing on the motion.  Sabrina Green testified that she was
assisting with the production of a television show called “The Defendant” for a
television production company.  The production company obtained information
pertaining to appellant’s case from his bonding company, and the production
company recorded a video of an interview with Singh in May 2010. 

During the interview, Singh was asked if he could
identify either of the robbers if provided with an array of photos.[1]  Singh
responded, “I think I should be able to.”  The video reflects the following
exchange with approximate timestamps noted:

Interviewer
[0:09]:  So, I’m going to show you some pictures that may or may not be the
person.  Uh, and you just kind of point out.

Singh [0:14]:             Ah,
I’ll try my best.  It’s been so long I haven’t remembered that, you know, at
that time I told them on that day I was so certain, but it’s been over five
months, but I’ll try my best if I can.

[At 0:32, the interviewer lays out five individual photos
on the counter, and Singh begins looking at the photos.]

Singh [0:37]:             [Pointing
to one photo.]  Not this guy.

Singh [0:50]:             I
think he was, um.

Singh [1:03]:             I
[inaudible] want to be 100% sure which one was it that day.  I, I—

Interviewer
[1:07]:  He may or may not be there at all.

Singh [1:10]:             Yeah,
that, that’s what I’m saying.  I’m not 100% sure.

Singh [1:15]:             [Not
indicating.]  That guy, no.  Not that one.

Singh [1:19]:             I’m
not 100% sure out of these ones.  I don’t want to just pinpoint at somebody and
say that was it.

[At 1:26, Singh furrows his brow for a moment as if puzzled
or concentrating intently.]

Singh [1:36]:             I
don’t want to make any guesses on these ones.  I think it wasn’t that guy. 
[Indicating to the photo previously excluded.]

Singh [1:47]:             [Singh
stops looking at photos.]  I don’t want to make any guesses.

The photo spread included one
photo of appellant and one photo of Parker.  From timestamp 0:32, when the
photos are placed on the counter, to 1:47, Singh does not appear to take his
eyes off the photos.

            After the
interview, Green left a voicemail for Ruzzo, saying that she “had information
in regards to Tommy Seamster’s hearing.”  The record does not reflect whether
Ruzzo received or listened to the message, but he testified that he did not
learn about the production company’s interview with Singh until immediately
after trial when appellant’s mother told him about the video.  Appellant’s
mother testified that she told Ruzzo about the video five or six times prior to
trial.  Appellant testified that he told Ruzzo, “We have information [that]
could help in my case,” but he did not specifically mention the photo spread,
video, or television production company.  Parker’s lawyers learned of the
video’s existence from Parker’s family, and one of his lawyers testified that
they would have obtained a copy of the video if Parker’s case had gone to
trial.[2] 
Ruzzo did not recall speaking with Parker’s lawyers, though he may have done so
once in the courtroom.

            Finally, Ruzzo
testified that he did not send his investigator to the scene of the crime to
interview Singh.  However, Ruzzo testified that he interviewed Singh prior to
trial, and Singh told Ruzzo that Singh “could identify the person in the
robbery.”  At trial, Singh testified that he did not talk to Ruzzo before
trial.

            The trial court
denied appellant’s motion for new trial, and this appeal followed.

Analysis

Appellant argues that the trial court abused its
discretion in denying his motion for new trial.  In particular, appellant argues
(1) Ruzzo was deficient by failing to adequately investigate his case, which
resulted in Ruzzo’s inability to impeach Singh’s identification testimony with
the television production company’s video, and (2) this failure to investigate
caused appellant prejudice by undermining confidence in the outcome of the
trial.

To prevail on an ineffective assistance claim, an
appellant must show that (1) counsel’s performance was deficient by falling
below an objective standard of reasonableness and (2) counsel’s deficiency
caused the appellant prejudice—there is a probability sufficient to undermine
confidence in the outcome that but for counsel’s errors, the result of the
proceeding would have been different.  Strickland v. Washington, 466
U.S. 668, 687–88, 694 (1984); Perez v. State, 310 S.W.3d 890, 892–93
(Tex. Crim. App. 2010).  An appellant must satisfy both prongs by a
preponderance of the evidence; failure to demonstrate either deficient
performance or prejudice will defeat a claim of ineffectiveness.  Perez,
310 S.W.3d at 893.

When, as here, the prejudice prong of the Strickland
test is dispositive, we need address only that prong on appeal.  See My Thi
Tieu v. State, 299 S.W.3d 216, 225 (Tex. App.—Houston [14th Dist.] 2009,
pet. ref‘d) (citing Strickland, 466 U.S. at 697).  We review de novo the
trial court’s decision on the prejudice prong while giving deference to the
trial court’s implied resolution of underlying factual determinations in
support of the denial of the motion for new trial.  Johnson v. State,
169 S.W.3d 223, 239 (Tex. Crim. App. 2005) (quoting Charles v. State,
146 S.W.3d 204, 213 (Tex. Crim. App. 2004), superseded by Tex. R. App. P. 21.8(b) (amended
2007)).[3]

To determine whether an appellant has established
prejudice based on counsel’s failure to investigate and introduce evidence, we look
to the totality of the evidence to determine whether there is a reasonable probability—one
sufficient to undermine our confidence in the verdict—that but for counsel’s
failure to investigate and obtain certain evidence, the jury “would have had a
reasonable doubt respecting guilt.”  Strickland, 466 U.S. at 694–95; Perez,
310 S.W.3d at 894.  This inquiry requires us to “reweigh the evidence”
supporting appellant’s conviction “against the totality of available . . .
evidence,” including the evidence that could have been offered if counsel had
performed a proper investigation.  See Wiggins v. Smith, 539 U.S. 510,
534 (2003) (weighing the evidence of aggravation in sentencing against the
totality of available mitigating evidence that counsel did not discover as a
result of a deficient investigation); Perez, 310 S.W.3d at 896 (“We
compare the evidence presented by the State with the evidence the jury did not
hear due to trial counsel’s failure to investigate.” (quotation omitted)).

Accordingly, two important considerations are (1) the
overall strength of the State’s case and (2) the potential value to the defense
of the undiscovered evidence.  See Perez, 310 S.W.3d at 895–96
(explaining “we must also consider the relative strength of the State’s case”;
conceding that “the State’s case was not strong”; but finding no prejudice in
counsel’s failure to investigate an alleged alibi witness because the witness’s
testimony was “too vague to be of any benefit” to the defendant and did not
provide the defendant with an alibi for part of the time the burglary could
have been committed); see also Strickland, 466 U.S. at 696 (“Moreover, a
verdict . . . only weakly supported by the record is more likely to have been
affected by errors than one with overwhelming record support.”); Anderson v.
Johnson, 338 F.3d 382, 393–94 & n.55 (5th Cir. 2003) (concluding that
the defendant was prejudiced by counsel’s failure to investigate and present
exculpatory evidence when the totality of the evidence against the defendant
was “relatively weak” rather than “overwhelming,” and the undiscovered evidence
“would have been a powerful rebuttal” to the State’s evidence).

Here, the overall strength of the State’s case
against appellant is neither “weak” nor “overwhelming,” but somewhere in the
middle.[4] 
In addition to Singh’s on-scene and in-court identifications, the State
presented evidence linking appellant to (1) the getaway vehicle, (2) a second
vehicle, which in turn was linked to the acquisition of and departure from the getaway
vehicle, and (3) a codefendant, who was also linked to the two vehicles near
the time of the robbery.  The State also presented a witness who identified
appellant as one of two robbers during another armed robbery at a nearby Shell gas
station the same morning.

In greater detail, the State presented the following
evidence:

·       
Elliot Turner testified that at about 9:38 a.m. on December 26,
2009, he observed two black males stealing his black Dodge Intrepid near his
apartment on Aldine Bender Road.  One of the men used a screwdriver to steal
the Intrepid, while the other man sat in a “goldish, tannish color” Buick Park
Avenue.  The man in the Buick showed Turner a gun and said, among other things,
“It’s our car now.”  At a show-up identification later that day, Turner
“clearly” identified Parker as the man with the screwdriver.  Turner also made
a tentative identification of appellant as the man with the gun in the gold
Buick.[5] 
A few days later, Turner picked both appellant and Parker out of photo spreads
and noted that appellant was the man with the gun sitting in the gold Buick. 
Finally, Turner made an in-court identification of appellant as the man with
the gun in the gold Buick.

·       
Singh testified that he was robbed at about 10:00 a.m. while he
worked at a Shell gas station located at the intersection of Beltway 8 and
Veteran Road.  Singh identified the color, make, and model of the getaway vehicle
as a black Dodge Intrepid, and he recorded the license plate as PZK 994.  He
gave this information to police shortly after the robbery.  Later that day,
both appellant and Parker were brought to the scene of the crime, and Singh
identified appellant as the robber with a gun.  Singh did not identify Parker
as one of the robbers.  Singh also made an in-court identification of appellant
as the robber with the gun.

·       
Meybel Guvera testified that she was working at a different Shell
gas station located at the intersection of Beltway 8 and Tidwell Road.  During
the morning on December 26, 2009, two black men robbed her.  One of the men
waved a gun in her face.  Later that day, she identified appellant as one of
the robbers during a show-up identification.  She also made an in-court
identification of appellant as the robber with the gun.

·       
Kenedy Munguia testified that he was at the intersection of
Tidwell Road and Van Hut at some point between 11:00 a.m. and 12:00 p.m. on
December 26, 2009.  He observed a “bluish black” Dodge Intrepid drive off the
side of the roadway and crash.  Two black men exited the Intrepid, ran across a
road, and entered a “brownish, goldish color four door” Buick.  Munguia noticed
that the Buick had a white cardboard or paper license plate on the rear, and he
did not remember seeing a license plate on the front.  Munguia called police to
report the incident, and later that day, he was asked to drive to a Shell gas
station to identify the men running from the Intrepid.  During a show-up
identification, Munguia identified appellant as one of the men running from the
Intrepid and entering the Buick.  He also made an in-court identification of
appellant as one of the men.  The abandoned Intrepid that Munguia observed was
later recovered by police; the license plate was RZK 884.

·       
Deputy Craig Berry testified that he was driving on Tidwell Road
when he observed a gold Buick parked near a convenience store.  He noticed that
the Buick had a paper license plate on the back and no front license plate.  As
appellant and Parker exited the store in the direction of the Buick, Deputy
Berry and another deputy intervened.  The deputies brought appellant and Parker
to the Shell gas stations for the show-up identifications discussed above.[6]

In evaluating the strength of
the State’s case, we also note the State did not introduce any of the following
into evidence: a gun, stolen proceeds, a mask or sweatshirt the robber with the
gun wore during the robbery, or any forensic evidence linking appellant to the
Intrepid or the crime scene.

Next, we consider the potential value of the
undiscovered evidence—a video showing that Singh was unable or unwilling[7] to pick
appellant’s photo out of a photo spread—and weigh the totality of evidence
against the State’s evidence.  Appellant has cited no case in which an attorney’s
proper investigation under Strickland would have revealed the type of
impeachment evidence involved in this case.  Our review of reported decisions
similarly shows that many failure-to-investigate-witness cases involve more direct
favorable evidence—for example, alibi witnesses, eyewitnesses who disclaim the
defendant as the perpetrator, or eyewitnesses who actually identify another
person as the perpetrator.[8]

The type of impeachment evidence at issue in this
case, where Singh was either unable or unwilling to identify appellant in a
photo spread administered by a television production crew rather than law
enforcement, is markedly different from the very clear “undiscovered witness” exculpatory
evidence at issue in the ineffective assistance cases cited above.  The
impeachment evidence at issue in this case is more similar to the type of
evidence that an investigative State agency would collect: a witness’s failure
or refusal to make an identification before trial.  In some cases, the State
does not turn over such impeachment evidence to a defendant in violation of Brady
v. Maryland, 373 U.S. 83 (1963).  See, e.g., Hall v. State,
283 S.W.3d 137, 177–78 (Tex. App.—Austin 2009, pet. ref’d) (reversing for a new
trial on punishment when the State failed to disclose that a key punishment
witness who attributed statements to the defendant and made an in-court
identification had been unable to pick the defendant’s photo from of a photo
spread before trial).  Because the analysis of whether evidence is “material”
under Brady is identical to whether a defendant is prejudiced under Strickland,[9] we find
those cases persuasive for resolving appellant’s ineffective assistance claim.

We acknowledge that “eyewitness testimony is highly
regarded by juries, rather more than its objective appraisal might warrant.”  Smith
v. Black, 904 F.2d 950, 967 (5th Cir. 1990), vacated on other grounds by
503 U.S. 930 (1992).  Accordingly, the nondisclosure of evidence that could be
used to impeach a key witness will often undermine confidence in the outcome,
creating a reasonable probability that the result of the proceeding would have
been different.  See id.; see also Kyles, 514 U.S. at 433 (noting
that the Court has “disavowed any difference between exculpatory and
impeachment evidence for Brady purposes”).  And as the United States
Supreme Court has explained, the nondisclosure of evidence that would allow for
the “the effective impeachment of one eyewitness can call for a new trial even
though the attack does not extend directly to others.”  Kyles, 514 U.S. at
445 (citing United States v. Agurs, 427 U.S. 97, 112–13 n.21 (1976)).[10]

In analyzing the issue before us, we focus on whether
there is a reasonable probability that the jury would have had a reasonable
doubt respecting guilt if Ruzzo had obtained and used the impeachment evidence. 
In Lindsey v. King, a case of “agonizing closeness,” the Fifth Circuit
reversed the defendant’s conviction when two eyewitnesses identified the
defendant as the murderer, but the State withheld impeachment evidence relating
to only one of the witnesses.  769 F.2d at 1042–43.  The first eyewitness had
stated in an interview conducted over a week after the murder that he only saw
a silhouette of the perpetrator and that viewing any photographs would be
useless because he did not see the perpetrator’s face.  Id. at 1036. 
His trial testimony, however, directly contradicted his prior statements: he
testified that he saw the defendant’s face and that he could have identified
him on the night of the murder.  Id. at 1040.  He also made an in-court
identification.  Id.  In light of the fact that this was a capital case,
and another person at the scene of the crime allegedly bore a “striking
resemblance” to the defendant, the Fifth Circuit decided to give the defendant
“the benefit of the doubt” and reversed the conviction.  Id. at 1042–43.

In Kyles v. Whitley, the Supreme Court similarly
reversed a defendant’s conviction for murder when the State presented four
eyewitnesses who made a positive identification of the defendant as the
perpetrator.  514 U.S. at 430, 455.  The State also presented evidence that the
murder weapon with one spent cartridge, additional ammunition, a holster, and
pet food matching the type purchased by the victim were found in the
defendant’s home, and the victim’s purse was found in the defendant’s garbage. 
Id. at 427–28.  Further, the defendant’s fingerprint was found on a
receipt from the grocery store where the victim had been shopping immediately
before she was murdered; and the receipt itself was found in the victim’s
vehicle, which the murderer had driven away from the crime scene.  Id.
at 428.  Despite all of this strong evidence, the Court reversed because most
of the evidence could have been called into doubt by a plethora of undisclosed impeachment
evidence: one eyewitness initially gave police a description that did not match
the defendant but rather matched the State’s informant; one eyewitness had
initially stated he had not seen the killer outside the victim’s vehicle and
that he had not seen the killing itself, but he testified later that he had
seen the shooting; and finally, the State’s informant, who did not testify but generally
guided the investigation of the case, had given numerous inconsistent
statements sufficient to raise suspicions of his own guilt, and he had both the
motive and opportunity to plant the physical evidence linking the defendant to
the crime.  See id. at 453–54.

The Court reasoned in Kyles, however, that it
was the cumulative effect of the undisclosed impeachment evidence—which
tainted both the identification of the defendant as the murderer and the physical
evidence linking him to the crime—that created a “significantly weaker case”
for the State, mandating reversal.  Id. at 454.  The Court noted:
“Perhaps, confidence that the verdict would have been the same could survive
the evidence impeaching even two eyewitnesses if the discoveries of the gun and
purse were above suspicion.”  Id.

Four years later, the Court reached a different
result when the State withheld evidence that could have “severely impeached”
the State’s eyewitness who “provided the only disinterested, narrative account”
of the defendant’s abduction of the murder victim.  Strickler v. Greene,
527 U.S. 263, 293, 296 (1999).  The witness gave very detailed testimony about
how the defendant and two other people entered the victim’s vehicle, attacked
her, and forced her to drive away.  See id. at 271–73.  The witness made
an in-court identification of the defendant and identified the victim from a
photo.  Id. at 272.  She bolstered her own testimony: “I have an
exceptionally good memory. . . .  So I have absolutely no doubt of my
identification.”  Id. at 272–73.  The undisclosed evidence included an
investigator’s notes that the witness could not identify the victim, could only
identify a female accomplice, and was not sure whether she could identify the two
men who entered the victim’s vehicle (one of whom was the defendant).  Id.
at 273.  The witness also sent letters to an investigator, stating in part that
she had not remembered being at the crime scene until her daughter jogged her
memory, she had a “very vague memory that I’m not sure of,” she had “muddled
memories,” and she questioned whether two of her memories were of the same
person.  Id. at 273–74.

The Court in Strickler noted the “obvious
significance” of the witness’s testimony, id. at 296, and acknowledged
that “discrediting her testimony might have changed the outcome of the trial.” 
Id. at 289.  Further, the trial court was “surely correct that there is
a reasonable possibility that either a total, or just substantial,
discount of [her] testimony might have produced a different result.”  Id.
at 291.  However, the Court reiterated the test for materiality—“a reasonable probability
of a different result”—and found such a probability lacking.  Id.  In
reaching this conclusion, the Court noted the other significant eyewitness and
physical evidence of guilt, which tied the defendant to the scene of the
murder, the victim’s vehicle, and the victim’s personal belongings.  See id.
at 293–94 & n.41.[11]

Although the evidence tying appellant to the robbery
in this case is less substantial than the forensic and physical evidence in Strickler,
the evidence is also significantly less suspicious than the evidence in Kyles. 
As in Strickler, the vast majority of the State’s evidence in
appellant’s case would not be directly impeached by the television production
company’s video of Singh.  Further, the value of the impeachment evidence in
this case is lower than the value of the impeachment evidence found in Strickler,
Kyles, and Lindsey.  We acknowledge that Singh’s refusal to pick
out appellant’s photo prior to trial casts some doubt on his later, in-court
identification.  The video may even have some impeachment value for Singh’s
prior, on-scene identification.

But we think the sequence of events is important:
Singh initially made an in-person identification of appellant, and only later
was Singh unable or unwilling to make an identification from a photo spread.  In
the Lindsey, Kyles, and Strickler decisions, the
eyewitnesses were first unable to make an identification (or made impeaching
statements related to identification) and only later did they completely
contradict their earlier statements.  The fact that the unsuccessful
identification occurred after the positive identification bears on the lesser
weight of the impeachment evidence.  Further, Singh did not completely contradict
the initial on-scene identification.  The State correctly notes that Singh
never stated during the interview that he could not identify appellant as the
robber.  Singh even bolstered his prior identification during the interview—he
reiterated that he was “so certain” of his positive identification on the day
of the crime.

Due to the general persuasiveness of eyewitness
testimony, we recognize there is a possibility the result of the trial
would have been different if counsel had discovered and used the impeachment
evidence in this case.  But “possibility” is not the standard.  When we weigh
the totality of evidence against the State’s evidence, we are not convinced
that there is a reasonable probability—sufficient to undermine our confidence
in the verdict—that but for counsel’s failure to discover and use the
impeachment evidence, the jury would have had a reasonable doubt respecting guilt.

Accordingly, appellant’s sole issue is overruled, and
the trial court’s judgment is affirmed.

                                                                                    

                                                                        /s/        Sharon
McCally

                                                                                    Justice

 

 

Panel consists of Justices Frost,
Jamison, and McCally.

Publish — Tex. R. App. P. 47.2(b).









[1]
The relevant portion of the video and the photos displayed in the video were
admitted into evidence during the hearing and are part of the record on
appeal.  





[2]
The case against Parker was dismissed prior to trial.





[3]
Appellant acknowledged at oral argument that we should defer to the trial
court’s implied factual findings based on conflicts in the evidence.  We assume
that Ruzzo interviewed Singh prior to trial.  We also assume that Ruzzo was not
specifically told about the existence of the video before the jury rendered its
verdict.  Specifically, we disagree with appellant’s assertions that “the
videotape of such interview with the complainant was made known to defense
counsel, . . . and [counsel] did not contact the complainant, either himself or
through an investigator, until trial started.”





[4]
Compare Anderson, 338 F.3d at 393–94 (concluding the State’s case for
attempted kidnapping was “weak” when the evidence consisted primarily of
eyewitness identification of the defendant as the perpetrator, which resulted
from the victim’s fortuitous encounter with the defendant three years after the
crime), and Perez, 310 S.W.3d at 896 (concluding the State’s case for
robbery was “not strong” when three witnesses testified and the only witness to
identify the defendant as the robber, whose face was partially obscured by a
bandana, was a thirteen-year-old boy who also disagreed with the only other
eyewitness as to the time of the robbery by a period of two hours), with
Howard v. State, 239 S.W.3d 359, 368 (Tex. App.—San Antonio 2007, pet.
ref’d) (concluding the evidence was “overwhelming” for aggravated assault when
it consisted of the testimony of four people who testified that they witnessed
the defendant cut or stab the complainant); Novak v. State, 837 S.W.2d
681, 684 (Tex. App.—Houston [1st Dist.] 1992, pet. ref’d) (concluding the
evidence was “overwhelming” for aggravated robbery when it consisted of the
complainant’s positive identification on the night of the robbery, the
complainant’s in-court identification, testimony that appellant’s accomplice
was seen with appellant near the complainant’s home shortly after the robbery
at a time when no businesses in the area were open, the appellant and
accomplice split up when officers approached in a patrol car, the accomplice
fled from police, and the accomplice had the following items on his person at
the time of arrest: the complainant’s gun, holster, ammunition, chemical mace
spray, ATM card, Social Security card, and camera).





[5]
Turner explained, “His lips were familiar but I guess in the car he—I thought
he was a little brighter than he actually was in person.  I was really only
able to identify the car and his muscle shirt and his lips I remembered.  But I
did think he was a little brighter than he came out to be.”





[6]
Appellant testified that Parker drove him to this convenience store in Parker’s
gold Buick Park Avenue.





[7]
The State argues in its brief that the video “does not prove that Mr. Singh
could not identify appellant.”  Similarly, at oral argument, the State argued
that the video does not “conclusively prove” that Singh was “unable” to
identify appellant.  The State is correct, but our review of the undiscovered
evidence is not limited to what the evidence “proves.”  We consider the
evidence in a broader light, looking to what conclusions a jury could draw from
the evidence.  See Kyles, 514 U.S. at 453–54 (holding that the State’s
failure to disclose certain evidence undermined confidence in the outcome of
the trial; and evaluating the evidence in terms of what “[t]he jury would have
been entitled to find”—described as “possible findings”—rather than what the
evidence conclusively established); see also Lindsey v. King, 769 F.2d
1034, 1042 (5th Cir. 1985) (refusing to “retry the case in our imaginations”
and explaining that the impeachment evidence had the “potential for both the
destruction of [a witness’s] identification of [the defendant] and the
discrediting, in some degree, of the police methods employed in assembling the
case against him”).  Given that Singh looked at the photos for over a minute,
was able to exclude one person as a robber, and refused to identify anyone else
as a robber because he was “not 100% sure,” a jury would be entitled to find
that Singh was either unwilling or unable to identify appellant from the photo
spread.





[8]
See, e.g., Anderson, 338 F.3d at 385, 393–94 (finding prejudice
when counsel failed to interview an eyewitness who would testify that the
defendant was not the perpetrator); Perez, 310 S.W.3d at 895, 897
(finding no prejudice because the alleged alibi witness, whom counsel failed to
present, only excluded the defendant as the perpetrator for part of the time
period during which the crime was committed); Butler v. State, 716
S.W.2d 48, 56 (Tex. Crim. App. 1986) (finding prejudice when counsel failed to
discover two witnesses who would testify that someone other than the defendant
was the robber and another witness who would testify that the defendant was
somewhere else at the exact time of the robbery); In re I.R., 124 S.W.3d
294, 302 (Tex. App.—El Paso 2003, no pet.) (finding prejudice when counsel
failed to interview an alibi witness); see also Beltran v. Cockrell, 294
F.3d 730, 735 (5th Cir. 2002) (finding prejudice when counsel failed to
discover that the defendant’s codefendant had a tattoo matching the description
of the perpetrator, and counsel failed to then impeach three witnesses who had
tentatively identified a codefendant rather than the defendant as the
perpetrator).





[9]
Johnson v. Scott, 68 F.3d 106, 109–10 (5th Cir. 1995) (“The materiality
standard under Brady v. Maryland is identical to the prejudice standard
under Strickland.”); see Strickland, 466 U.S. at 694 (“[T]he
appropriate test for prejudice finds its roots in the test for materiality of
exculpatory information not disclosed to the defense by the prosecution . . .
.”); see also United States v. Bagley, 473 U.S. 667, 682 (1985) (“We
find the Strickland formulation of the Agurs test for materiality
sufficiently flexible to cover the . . . prosecutorial failure to disclose
evidence favorable to the accused: The evidence is material only if there is a
reasonable probability that, had the evidence been disclosed to the defense,
the result of the proceeding would have been different.  A ‘reasonable
probability’ is a probability sufficient to undermine confidence in the
outcome.”); Johnson, 169 S.W.3d at 230 (“And suppression of exculpatory
evidence and ineffective assistance of counsel claims are governed by the Strickland
materiality/prejudice standard: whether there is a reasonable probability that
. . . the result of the proceeding would have been different.” (alteration in
original) (quotation omitted)).





[10]
See also Lindsey, 769 F.2d at 1043 (“[P]ositive identification by two
unshaken witnesses possesses many times the power of such an identification by
one only, and . . . the destruction by cross-examination of the credibility of
one of two crucial witnesses—even if the other remains untouched—may have
consequences for the case extending far beyond the discrediting of his own
testimony.”).





[11]
The evidence included hair similar to the defendant’s found at the crime scene,
the defendant’s possession of the victim’s personal belongings, an eyewitness
placing the defendant near the scene of the crime, blood on the defendant’s
clothes, an accomplice’s wallet found near the crime scene, and physical and
eyewitness testimony that placed the defendant in the victim’s car after the
murder.  Strickler, 527 U.S. at 267–69, 293 n.41.